UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ROCKFORD J. RAHMAN,**

    **Petitioner,**

v.                                              Case No. 8:17-cv-2464-MSS-SPF

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

    **Respondent.**
_____/

**O R D E R**

    Rahman petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for attempted sexual battery and lewd and lascivious battery (Doc. 1), the Respondent asserts that the amended petition is untimely (Doc. 25), and Rahman replies that his actual innocence excuses the time bar. (Doc. 21 at 4) The parties submitted supplemental briefs addressing actual innocence. (Docs. 39 and 40) After reviewing the pleadings and the relevant state court record (Docs. 25-1, 39-2, and 40-1), the Court **DISMISSES** the petition as time barred.

**PROCEDURAL HISTORY**

    Rahman pleaded guilty to two counts of attempted sexual battery and two counts of lewd and lascivious battery, and the trial court sentenced him to two concurrent terms of twenty-five years for the sexual battery convictions and two concurrent terms of fifteen years for the lewd and lascivious battery convictions. (Doc. 25-1 at 8–13) Rahman did not appeal.

    Rahman moved for post-conviction relief (Doc. 25-1 at 20–28), the post-conviction court denied relief (Doc. 25-1 at 32–36), and Rahman did not appeal. Rahman filed a second

1

motion for post-conviction relief (Doc. 25-1 at 49–55), the post-conviction court denied relief (Doc. 25-1 at 80–89), Rahman appealed, and the state appellate court affirmed. (Doc. 25-1 at 111) Rahman sought post-conviction relief in the state supreme court (Doc. 25-1 at 115–29), and the state supreme court denied relief. (Doc. 25-1 at 131)

Rahman's federal petition followed. In his federal petition, Rahman asserts (1) a detective violated his federal rights by arresting him without probable cause, (2) the trial court violated his federal right to due process by permitting the detective who arrested him to set bail, (3) the prosecutor violated his federal rights by not dismissing the criminal case after learning that the detective unlawfully arrested him, and (4) the state court violated his federal rights by permitting him to plead guilty even though the detective unlawfully arrested him and set bail. (Doc. 1 at 5–6) In a supplemental pleading, Rahman further asserts that his sentence of twenty-five years in prison for attempted sexual battery exceeds the statutory maximum sentence. (Doc. 21 at 3–4)

## ANALYSIS

A one-year statute of limitation applies to a federal habeas petition challenging a state court judgment. 28 U.S.C. § 2244(d)(1). The limitation period begins to run "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). On June 20, 2012, the judgment in Rahman's criminal case entered (Doc. 25-1 at 8–14, 17), Rahman did not appeal, and the time to appeal expired thirty days later — July 23, 2012. Fla. R. App. P. 9.140(b)(3); Fla. R. Jud. Admin. 2.514(a)(1)(C). The limitation period started to run the next day. Fed. R. Civ. P. 6(a)(1)(A). *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011).

"[A] properly filed application for State post-conviction or other collateral review" tolls the limitation period. 28 U.S.C. § 2244(d)(2). The limitation period ran for 324 days until June 13, 2013, when Rahman placed in the hands of prison officials for mailing a motion for post-conviction relief. (Doc. 25-1 at 20–28) On January 9, 2014, the post-conviction court denied the motion. (Doc. 25-1 at 32–36) Rahman did not appeal, and the time to appeal expired thirty days later — February 10, 2014. Fla. R. App. P. 9.110(b) and 9.141(b)(1). The limitation period started to run the next day and continued to run until it expired forty-one days later — March 24, 2014. Fed. R. Civ. P. 6(a)(1)(C).

Rahman placed in the hands of prison officials for mailing his federal petition on October 16, 2017 (Doc. 1 at 1) and his supplemental petition on March 19, 2018. (Doc. 21 at 6) Consequently, the claims in the petition and the supplemental petition are untimely.

On May 30, 2016, Rahman placed in the hands of prison officials for mailing a second motion for post-conviction relief. (Doc. 25-1 at 49–55) Also, on August 4, 2017, he placed in the hands of prison officials for mailing a petition for a writ of habeas corpus. (Doc. 25-1 at 115–29) Because Rahman filed the motion and the petition after the limitation period expired, neither tolled the limitation period. *Sibley v. Culliver*, 377 F.3d 1196, 1204 (11th Cir. 2004) ("[O]nce a deadline has expired, there is nothing left to toll. A state court filing after the federal habeas filing deadline does not revive it.").

Rahman contends that the victim falsely accused him of the crimes, that physical evidence did not support the accusations, and that DNA evidence exonerated him. (Doc. 21 at 4) "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass . . . [the] expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not

3

meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Rahman submits the following documents to prove his actual innocence (Doc. 40-1): (1) a transcript of a 911 call by his wife, (2) a written statement by Rahman's wife, (3) excerpts of police reports, (4) an excerpt of a transcript of an interrogation of Rahman, (5) an excerpt of a police report summarizing Rahman's confession, (6) the arrest affidavit, (7) the information, (8) the judgment and sentence, (9) the change of plea form, (10) two evidence receipts, (11) reports of DNA testing, (12) an excerpt of a transcript of a deposition of a neighbor, and (13) reports by Child Protective Services.

Rahman contends that these documents demonstrate his actual innocence (Doc. 40 at 3): "Rahman is claiming actual innocence based on the State's own documented evidence such as, medical reports, investigative reports from Child Protective Services, the alleged victim's own testimony, the State's witnesses' deposition testimony, and physical and scientific findings from FDLE's biology lab in its DNA testing."

Rahman fails to demonstrate that these documents constitute "new" evidence. Rahman could have obtained with reasonable diligence the information, the change of plea form, the judgment and sentence, the police and Child Protective Service reports, the arrest affidavit, the transcript of the 911 call, the written statement, the transcript of the

4

interrogation, the evidence receipts, and the deposition transcript. *Schlup*, 513 U.S. at 324 (describing a credible claim of actual innocence as supported by "new reliable evidence . . . that was not presented at trial"); *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only 'new' if it was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'") (citation omitted).

The post-conviction court further determined that the prosecutor disclosed the DNA reports to the defense before trial (Doc. 39-2 at 45–46) (italics in original):

> The Defendant compounds the contradictory nature of his claim by acknowledging that in 2013, he requested and received copies of his discovery from his attorney. He acknowledges that included in this discovery were the FDLE lab results he now categorizes as newly discovered evidence, yet he fails to explain why it took him until "June of 2014," to discover the significance of the FDLE reports he received, when, by his own admission, he received this information in 2013. The Court again notes that regardless of how recently a defendant has discovered the evidence, "[a] claim of newly discovered evidence must be filed within two years from the date the evidence could have been discovered with the exercise of due diligence." *Burns*, 110 So. 3d at 96. Even assuming, arguendo, that the Court finds credence in the Defendant's claim that he did not truly discover the significance of the FDLE reports until June 2014, the Defendant should note that by his own admission, he actually *received* this information from his attorney in 2013. Therefore, he "could have discovered" this information in 2013, when the documentation was originally sent to him by counsel, and his motion alleging newly discovered evidence should have been filed two years from that time. Notwithstanding the Defendant's specious claim on this point, he also overlooks the fact that the information he repeatedly refers to as "newly discovered evidence," was a part of discovery. Simply put, the Defendant's claim does not amount to newly discovered evidence. This is so, because given the fact this information was provided to the defense during discovery, the Defendant cannot claim it is newly discovered evidence. To that end, the record reflects that the State filed three "Additional Witness List and Acknowledgment of Tangible Evidence" filings in reference to the very same FDLE report (*i.e.*, FDLE #20110303480) that the Defendant has

included in his instant motion. Additionally, the record reflects that the State filed an "Acknowledgment of Tangible Evidence" in reference to a report made by the Pasco County Child Protective Team, a report that the Defendant has also included with his instant motion. The Defendant cannot claim that counsel was not aware of this information, because the record refutes any such claim. Specifically, the record reflects that on March 14, 2012, the defense filed a "Supplemental DNA Discovery Motion Regarding Conventional Serology Testing and Short Tandem Repeat (STR) Typing," seeking to compel the State to turn over "[c]opies of the serology case file including all reports, memoranda, notes, phone logs, contamination records and data relating to the testing performed in this case," a motion this Court ultimately granted. Thereafter, the State filed a fourth "Additional Witness List and Acknowledgement of Tangible Evidence," filing in reference to the FDLE results. The Defendant would do well to again take note that the aforementioned information that was provided to the defense as a part of discovery was available to him at the time of trial and he could have discovered it through the use of due diligence. Although the Defendant claims that he was unaware of this documentation until recently, again, as noted above, the record reflects that his counsel was aware of this documentation. Because counsel was aware of the FDLE results, this information is not newly discovered.

Documents attached the post-conviction court's order substantiate the determination that the DNA reports are not "new" evidence. (Doc. 39-2 at 52–59) Rahman fails to rebut that determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even if the documents constitute "new" evidence, Rahman must demonstrate "that it is more likely than not that 'no reasonable juror would have convicted him in light of the new evidence.'" *Rozzelle v. Sec'y, Fla. Dep't Corrs.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 537 (2006)). "'[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *Rozzelle*, 672 F.3d at 1017 (quoting *House*, 547 U.S. at 538).

### Arrest Affidavit and Change of Plea Form

When Rahman pleaded guilty, he agreed that "the judge may rely upon any probable cause statement . . . in the court file for a factual basis to justify the acceptance of [his] plea [ ]." (Doc. 25-1 at 38) The arrest affidavit summarized the facts that supported the guilty plea as follows (Doc. 39-2 at 2):

> The defendant, Rockford Rahman, entered his daughter's bedroom, who is an eleven-year-old female. The victim woke up to her father on her; [her father] had pulled her top down and licked her breasts. The victim pushed suspect off of her and immediately told her mother. The victim informed your affiant that, approximately two months after her tenth birthday, her father began sexual contact with her. The victim stated [that], during this time period, her father had licked her vagina [and] penetrated her vagina with his finger, and [the victim] has held her father's penis. Post-*Miranda*, [the] defendant confessed to licking the victim's breasts, licking her vagina, and touching her vagina.

### Information and Guilty Plea

The information charged Rahman with two counts of sexual battery for placing his mouth "in union with the sexual organ of [the victim]" and by penetrating the vagina of the victim with his finger. (Doc. 25-1 at 5) The information further charged Rahman with two counts of lewd and lascivious molestation for intentionally touching the victim's breasts or clothing covering her breasts and for intentionally forcing or enticing the victim to touch his penis or clothing covering his penis. (Doc. 25-1 at 6) Rahman pleaded guilty to two counts of attempted sexual battery, a lesser offense, and two counts of lewd and lascivious battery, also a lesser offense. (Doc. 25-1 at 38, 42)

### Transcript of 911 call and Written Statement by Rahman's Wife

Rahman contends that a transcript of the 911 call contradicts the written statement by his wife to police. (Doc. 40 at 15) However, the 911 report does not contain a transcript

7

of the 911 call and instead contains a summary of a statement by Rahman's wife to the 911 operator. (Doc. 40-1 at 1) The operator reported that Rahman's wife stated that she discovered Rahman "in her [eleven-year-old] daughter's room on top of her touching her inappropriately." (Doc. 40-1 at 2) In the written statement to police, Rahman's wife stated that she heard her daughter crying in the middle of the night and asked her what was wrong, and her daughter reported that Rahman touched her inappropriately. (Doc. 40-1 at 4)

**Excerpts of Police Reports and Transcript of Interrogation**

Rahman contends that police coerced his confession by detaining him and transporting him to the police station, interrogating him for three hours, and advising him of his constitutional rights only after the interrogation. (Doc. 40 at 4) He contends that he suffered from sleep deprivation, felt distraught, and confessed under duress. (Doc. 40 at 4–5)

The police report states that sheriff's deputies met with Rahman at work and that Rahman "voluntarily went back to the Pasco Sheriff's District Office and wanted to cooperate in [the] investigation." (Doc. 40-1 at 7) The two-page excerpt of the transcript of the interrogation shows that a detective confronted Rahman with the victim's accusations, Rahman denied the accusations, and the detective informed Rahman that he was not free to leave and was under arrest, advised Rahman of his constitutional rights, and concluded the interview. (Doc. 40-1 at 9–10)

An excerpt of a police report stated that Rahman appeared distraught after he learned that the sheriff's deputy would arrest him (Doc. 40-1 at 12):

> Mr. Rahman appeared to be emotionally distraught. I told him it is always best to be honest with himself and to others and this would be the best time to be honest and put things behind him and start fresh. I stated if he felt he needed any kind of help, he

8

> should seek that help out. I asked him if he wanted to tell Detective Christensen anything else before we prepared to transport him to the jail. Mr. Rahman stated he did wish to speak with her and tell her the truth of what happened. Mr. Rahman further stated he knows he needs help for what he has done.
>
> I then informed Detective Christensen that Mr. Rahman wanted to speak with her and tell her what happened. Detective Christensen then returned to the interview room to speak with Mr. Rahman.

An excerpt[1] of a police report by the detective summarized the interrogation (Doc. 43-2 at 6–7):

> I asked [Rahman] what happened after the conversation [with his wife] was done. [Rahman] stated he packed up some belongings and drove to work. [Rahman] stated he is an independent contractor and the warehouse is located at the Pasco Industrial Park located in the area of State Road 54 and Success Drive. [Rahman] advised he was contacted by law enforcement by phone and met with them at the warehouse. I informed [Rahman] the allegations that [the victim] told me. I advised [Rahman] that [the victim] told me that tonight he went into her room and licked her breasts. [Rahman] stated that was not true. I informed [Rahman] that I was told by [the victim] that he has also made her hold his penis and licked her vagina. [Rahman] stated that was not true. I advised [Rahman] that [the victim] also is claiming that he has penetrated her vagina with his fingers. [Rahman] stated that was not true. I requested from [Rahman] if he would voluntarily provide me with a DNA sample that would consist of a saliva swab sample and that I also wanted to swab his hands and nails. [Rahman] stated that he guessed. I told him he would have to answer yes or no. I advised [Rahman] that [the victim] will be taking an examination and asked if his DNA will be on [the victim]. [Rahman] stated no. I asked [Rahman] if he will submit to a DNA test and he advised sure. Shann Winkelmann photographed and processed [Rahman]. I obtained a signed consent from [Rahman] to obtain his saliva swab sample that was later placed into property as evidence.

---

[1] The excerpt of the report submitted by Rahman does not contain a summary of his confession. (Doc. 40-1 at 15) The Respondent supplemented the record with a copy of the entire report, including the summary of the confession. (Doc. 43-2)

9

I questioned [Rahman] on the sleeping arrangements of his family. [Rahman] stated [the victim] has her own room and [the victim's sister] has her own room. [Rahman] stated [the victim] usually goes to bed at approximately 8:30 P.M. and this evening she went to bed after him but [he] could not provide what time. I asked [Rahman] from the time he went to bed until the time he was woken up by his wife, if he ever went into [the victim's] bedroom. [Rahman] stated no. [Rahman] stated he did get up to use the bathroom and confirmed he used the one in the master bedroom. I asked [Rahman] if [the victim] is sexually active and he advised no, she doesn't even date. [Rahman] advised she did have a male friend at school, but is no longer speaking to him. I asked [Rahman] if [the victim] has ever seen him nude and he advised no. I asked [Rahman] if he checks on the children before he leaves work. [Rahman] advised he does check on the kids before he leaves for work but does not wake them, he just peeks into their bedroom.

Once I completed my interview with [Rahman], I made the decision to place him into custody and read him his *Miranda* rights and informed him he was not free to leave. I then left the room and Sergeant Buhs and Deputy Raymond Keener stood by with [Rahman]. I went into a separate room to write out my probable cause affidavit when I was informed by Sergeant Buhs that [Rahman] wanted to speak with me and to tell me the truth of what had happened. I started a separate audio and video recording of my contact with [Rahman]. The recordings were later placed into property as evidence. The below interview is not verbatim.

I again made contact with [Rahman] at approximately 8:37 A.M. in the interview room. I reminded [Rahman] of his *Miranda* rights and informed him he had a right not to speak with me without an attorney present. [Rahman] advised he understood and was willing to speak with me. [Rahman] stated approximately two years ago, his sexual contact started with his daughter [ ]. [Rahman] stated it was during the time period he had lost his job and his wife was working the midnight shift. [Rahman] did confirm this evening he licked [the victim's] chest area. [Rahman] also confirmed he had touched [the victim's] vagina under her clothing but did not insert his fingers into her. [Rahman] confirmed he had licked [the victim's] vagina. [Rahman] denied putting his penis into [the victim's] hand and stated that [the victim] at that time was holding his thumb. [Rahman] stated he needed help [ ] for his behavior with his

10

> daughter, and I informed [Rahman] I could not promise him anything but would inform the State Attorney's Office of his request and that he is seeking counseling for his behavior. [Rahman] stated that he has not sexually touched his other daughters or any other child.

**Excerpt of Transcript of Deposition of Neighbor**

During a deposition, a neighbor testified that he went to Rahman's home for a barbecue a few nights before Rahman's wife reported the crimes and the victim "hung all over her dad all the time" and "seemed to have the most, I guess, bond with her dad [ ]." (Doc. 40-1 at 34) Rahman contends that a child psychologist would testify that a victim would not act affectionately toward a sexual abuser. (Doc. 40 at 9–10)

**Evidence Receipts, DNA Reports, and CPS Reports**

A police report and evidence receipts show that a sheriff's deputy collected from the victim's bedroom clothing, a pillowcase, a comforter, and a bedsheet. (Doc. 40-1 at 24–25) Also, the deputy collected from Rahman an oral swab, a swab of his hands, and scrapings from his nails. (Doc. 40-1 at 24, 26) A nurse collected from the victim swabs of her mouth, vagina, and nipple and a cutting from her underpants. (Doc. 40-1 at 36)

A report by a nurse with Child Protective Services summarized the victim's accusation (Doc. 40-1 at 49):

> "My dad comes into my room at night and touches me inappropriately." Child pretends she is asleep. He made her touch his penis one time, but she did not see it. The incidents occur once or twice a week and have been happening for about one year. Most of the time he digitally penetrates her. He fondles her breasts and genital area. He puts his mouth on her breasts and genitals. "He put his mouth on my left breast tonight. I don't remember if he put his mouth 'down there' tonight." (Examiner pointed to genital area, and child nodded her head yes.) She has had no pain or bleeding during the incidents.

11

The nurse reported no physical findings. (Doc. 40-1 at 50–52)

An analyst found no semen on the swabs of the victim's mouth, vagina, and nipple and the cutting from her underpants. (Doc. 40-1 at 37) A DNA analyst obtained a mixed DNA profile belonging to at least two individuals from the victim's underpants. (Doc. 40-1 at 38, 40) The results were "insufficient for inclusion purposes" but were "suitable for exclusionary purposes." (Doc. 40-1 at 40) The DNA analyst attempted to compare Rahman's DNA with the mixed DNA profile from the victim's underpants but concluded (Doc. 40-1 at 42): "No determination can be made regarding the possible contribution of Rockford Rahman to the foreign DNA results obtained from the cutting [of] the underpants."

"[C]onsider[ing] all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," Rahman fails to demonstrate that it is more likely than not that no reasonable juror would have found him guilty. *Rozzelle*, 672 F.3d at 1017 (citation and internal quotations omitted). Even if Rahman felt distraught and deprived of sleep, he confessed to licking the victim's breasts, licking her vagina, and touching her vagina. (Docs. 39-2 at 2 and 43-2 at 7) Rahman's confession corroborated the victim's accusations. (Doc. 40-1 at 49) Rahman contends that a neighbor, who had a similar build and features as Rahman and engaged in an affair with Rahman's wife, committed the crimes. (Doc. 40-1 at 6–7) However, Rahman fails to support his contention with new reliable evidence. *Schlup*, 513 U.S. at 324.

The absence of DNA evidence does not exonerate Rahman. The victim reported that Rahman regularly penetrated her vagina with his finger and placed his mouth on her vagina

but did not remember whether Rahman "put his mouth 'down there'" the evening that she reported the crimes. (Doc. 40-1 at 49) Consequently, the absence of DNA on the swab of the victim's vagina does not exonerate Rahman. Also, Rahman confessed that he placed his mouth on the victim's chest that evening. (Doc. 43-2 at 7) Rahman presents no new evidence that demonstrates with any certainty that his DNA would have remained on the victim after he licked her chest. *Schlup*, 513 U.S. at 324.

The inconsistent statements by Rahman's wife concerning her observation of Rahman touching the victim inappropriately in the victim's bed versus learning of the incident from her daughter and the neighbor's observation of the victim acting affectionately toward Rahman do not demonstrate actual innocence. Rahman speculates that "[a]ny child psychologist who specializes in child sex abuse will testify that [the behavior observed by the neighbor] is not the normal behavior of a sexually abused victim." (Doc. 40 at 9) Rahman fails to present an affidavit by a child psychologist to substantiate this contention. *Schlup*, 513 U.S. at 324. Also, a juror may believe or disbelieve a witness who suffers impeachment with a prior inconsistent statement. *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("[I]ntroduction of a prior statement that is inconsistent with a witness's present testimony is [ ] one of the main ways to attack the credibility of a witness."). Even if the jury disbelieved Rahman's wife, a rational juror could rely on the victim's testimony, corroborated by Rahman's detailed confession, to find Rahman guilty beyond a reasonable doubt. *Rozzelle*, 672 F.3d at 1017.

Because Rahman fails to demonstrate that no reasonable juror would have convicted him in light of new reliable evidence, actual innocence does not excuse the time bar.

Accordingly, Rahman's petition (Doc. 1) is **DISMISSED** as time barred. The Clerk is **DIRECTED** to enter a judgment against Rahman and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Rahman neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on January 30, 2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE